Mr. Rosbach. Yes, Mr. Rosbach. May it please the Court, Eric Rosbach for plaintiff's appellants. I'd like to reserve five minutes for rebuttal. ML is a five-year-old boy diagnosed with autism, which means he needs services like speech, occupational, and behavioral therapies. In accordance with IDEA, the private school, or even if he attended a private school with some religious content. But the state won't pay for ML's therapies if he attends a religious school. That puts ML's parents in a bind. They have the choice of either giving him a Jewish education or giving him the speech therapy he needs. The Constitution resolves this problem because it forbids the state from enforcing the non-sectarian requirement in the Education Code under Trinity, Lutheran, Espinoza, and Carson. Excluding Jewish schools from IDEA funding, simply because they are Jewish, violates the First Amendment. I'd just like to start off by saying that the District Court made a number of errors here, but I think you can kind of sum them up as too much on standing and too little on the merits. Well, standing is a threshold question, so I'm not sure that's a fair complaint about the District Court doing our job. Can you talk to me about, I just want to make sure first I get everybody's name right, is it Peretz's? Or how do I pronounce it? Peretz, yes. Peretz? Peretz, yeah. So that family has six children, I think? Is that right? Yes. And five of them are attending an Orthodox school, and one, the child with a disability, is not? That's correct. Okay, and my understanding is their allegation is that that child is not getting a FAPE right now because of a certain type of speech therapy that's not available in the public school, a prompted speech therapy where there's touching is involved? Is that, do I understand that? Well, I would actually say also because they cannot have the child in the environment, that would be best for his unique needs. Part of their argument, as I understand it, is in, is it NP? NP, yes. Part of it, as I understand it, is NP's parents do not have even now the ability to advocate that part of his FAPE requirement is having this type of secular education because they would be talking to the wind because there would be no possibility under California law for him getting it, so they don't even have the right to advocate. So they're not even in a position where they can even advocate for it because it couldn't do any good? That's right. So normally the way the IEP team works is that people can put different things on the table as options, and the parents have an absolute right to be able to do that. That is, they're able to say, we want to send our, you know, we want to put this as an option for the IEP team to consider, and the way the statute is set up and the way that the regs are set up, they have the ability to do that, except in California they're not allowed to do one class which are religious schools. And that's the problem in this case. They normally would have the right to do that, put that into the discussion, and they're being denied that. So you're not arguing that if there are determination that the child was being denied faith, and then the team were to convene and talk about what to do, what the appropriate placement would be, you're not arguing, as I understand it, that the parents would be in a position to direct or unilaterally decide on the next best step. That's right. I think the way to think about it is that the unilateral part that they could do is to put that into the mix. That's the part that they would have. It's sort of a nomination to be considered on the table. Yes, before the, you know, when the Senate, then it gets considered by the Senate. So I think that that's a very similar idea. Right. Thank you. So going back to that point, opposing counsel can argue, and has argued in the briefing, that the IDEA doesn't guarantee anybody a secular education. It's about responding to disabilities. So without broaching that, it seems to me on the facts of this case alone, without exceeding the law, one of these six children is being, every day, getting up, well, five days a week, I guess, getting up and going to school, a different school than his sibling. Right. And IDEA, if there's one thing that is a cornerstone of that piece of legislation, it's mainstreaming and inclusion and not being treated differently. So it seems to me, for this particular child, there's a unique argument, and the parents might be wanting to make that argument, that this, that one of the orthodox schools should be considered, not because it's orthodox, but for a more fundamental reason, which is, we've got to go to a private, but this is, I'm going to, I want to hear from both parties to see why I'm wrong, but it seems to me that their position is going to be, we have to go to a private school because our child can't get the type of prompted speech therapy he needs in a public school. That's my first understanding, and please correct me if I'm wrong. And what they want to argue is that we want our child to be mainstreamed, as in not treated differently than his siblings. So we want consideration of the orthodox school where he currently contends, not that they get to choose that. That's right. So it's not something where we're saying at the end of the, you know, this case that we're going to get an injunction saying, you know, send this child to this school. It's just about having that option to have that discussion, and to make exactly the kind of thing you're talking about. I think the mainstreaming point that you make is excellent. That is that if you can have the siblings go together with each other, that is something that I think is often considered in IEP discussions. And it doesn't always prevail. It doesn't, it doesn't. That's right, Your Honor. So you just want the chance to make the pitch. That's right. It's sort of a right-to-try case. So I think we're trying, we're just trying to get a right to do this. You're saying that the reason you can't make this pitch is because of this California law. That's right, Your Honor. It's the California Education Code, and it's nothing in the IDEA that precludes you from making this pitch. That's right. That's right. And, and in fact, if you look at what the state's already doing, this is a very narrow case, because under the 10C funding, so that's that third, you know, we had that chart that we tried to use to make this somewhat more understandable on page 9 of our opening brief, that third line, it, they're already paying tuition at religious schools like North, New Harvest Christian School, Imago Dei, they're already getting it. And then under 10B, you have private school, you know, the Intermountain Homes Children's Home in Helena, Montana, has religious content as a Jewish chaplain, has Jewish mentors, and they're getting 10B funding. So that's what this case is about. So we're really just talking about a very small slice, which is 10B funding for these Orthodox Jewish families. I'm not sure you're making it so, such a small slice, because even though I, I fully appreciate that you want to get to the merits, but there is a standing component. So we've just been talking about standing vis-a-vis the one family with a child that we've, that we've discussed here, the child who's one of six. But there's also both schools seek a ruling that they have standing, and, and this one is much tougher, I think. Well, and I think, Your Honor, the good news is you don't actually have to address all those things. And what the district court should have done is once it decided that the Taxans had standing under the Little Sisters of the Poor case, footnote six, they, they actually should have, the court should have stopped. It was actually said in the Little Sisters case that it was error to go on and figure out the standing of the other parties. But since we're here, I'd like to figure out, and you want this case to be a narrow case, and I'm struggling to see how it's narrow. So as to the schools, we all understand the standing requirement, or we think we do, and, and it's a, it's a, it's a, it's jurisdictional. The district court had to satisfy herself that there was standing here. And, and you know about the Carson case, right? That's the judge who hadn't even tried to apply for... The Carney, the Carney case. Oh, forgive me. Yes. Thank you for correcting me. And then we have, well, I don't want to go through all the, you know these cases as well as I do. And so the problem I have in this case is that there's an allegation in the complaint that seems to be directly opposite the allegations that were made in declaration submitted in support of the preliminary injunction. In the, in the complaint, there's allegations, I can read them to you but you know them, about both the leaders of both schools really feeling compelled to make, to see if they could qualify as NPSs. Seek to qualify, yes. Yes, right. But in the, in the preliminary injunction, sorry, declaration submitted in support of the certification process would require me to violate the school's sincerely held religious beliefs because I would have to disavow the religious character of the institution, which of course he was not willing to do. That's... And I fully appreciate that and respect that, but the problem we've got, counsel, is that to go that route, I just, I just, I just cannot square that. I'm having a hard time squaring that with our standing jurisprudence that requires everybody who comes to the court to show the requirement of ready and able. So how do we reconcile that? So it's, so it's really at ER 205, there's this assurance statement and you're, you're swearing, you know, we're not gonna, we're not religious and that would be a lie. They are religious schools and so... Why do you think it requires them to swear they're not religious? Because it says in, at ER 205, they have to actually sign something on behalf of the school saying, as part of the application, this is part of the, so the ER... You're, you're, you're, and maybe I'm splitting hairs, but I'm certainly not suggesting that anybody affiliated with the school is gonna say I'm not religious, but it does say that we can't even begin this process. So there's no attempt to even like cross that out and say, you know, we're otherwise qualified and that's what I was looking for because we do have standing requirements. Well, right, but if, I think where the, where this comes up in, I guess I would say it's futility, right? So you have a futility response to that, which is just that if you have to check a box that says, you know, I'm not black, I'm not Jewish, I'm not something else and that's not true or, you know, you think it's a discriminatory barrier, you don't have to go any further. I would never suggest that that's required here, but what I am suggesting is there's, there's everything else that's required to be, to qualify as an MPS and I look, look, look to see where does it say that the curriculum otherwise satisfies what, whatever it is required, you know, all of the other requirements for NPSs and I, so my, really, this is a clumsy way of me asking you, is that in the record somewhere? That they, they've not applied, they definitely, oh yes, otherwise qualify except for the sectarian rule? Yes, we did, we did allege that. Where is that? That, that, that is alleged at ER 268-270. 268-270? Correct. Okay. Okay, but I, but can I go back to the point about, about, can we go back to the point about the, the standing, which is, I really, I do think that, I agree, obviously, you have to satisfy standing, but I do think that the court has been, the Supreme Court has been clear in the Little Sisters case that it is actually error to go and look at those other things. If you look at the new, new Civil Liberties Alliance, to look at, once, once you've decided, if the parties have the same claims and the same relief, which is the case here, that they're seeking, then once you decide one party has standing, it's error, the Supreme Court has said, to go further. And so they have to run the table. They have to run the table on their 12B1 motion. And I think what happened here is that the court, you know, when we get it, got into district court, I think the district court was planning or thinking that it was, anticipating that it was going to dismiss the, everyone for standing. And that's why there's, you know, every time we try to talk about that at the hearing, court says, I don't really want to hear about that. And then, as a result of the hearing, the court decided, you know what, actually this will create a circuit split with the First Circuit and Carson, because this is on all fours with Carson. Therefore, you know, changed its mind. Then it goes to the, it, but it should have taken the subsequent step of saying, like, I'm done with this now. And that's both the Supreme Court, that's other circuits. But back to 12B6, you have to look at, I mean, these, the plaintiffs, the parents are not similarly situated to the schools, in terms of standing. Right, but I think the ambit of that rule, at least is the way the Supreme Court was talking about it, is the same, same claims and the same forms of relief that you're seeking. Not really the same claims, because, no, I mean, the schools want to become NPSs, the parents want to advocate for their, for their kids. Right, but I think if you look at it through the lens of Carson, where there were no schools in the case, but it was all about whether schools could qualify for this tuition assistance program in Maine, the parents are the, are the ones asking for it, but they need the school to do it. So it's, they're kind of together on it. So I think, I think that it. So, so Ken Sal, how, I mean, theoretically, how would that work? That, let's say, totally as a theoretical hypothetical, we were to agree with you that the statute were unconstitutional, that the parentses have standing, and we were to agree with you somehow, that means under Little Sisters of the Poor, we don't have to address the standing of anyone else. And we were to send this case back to the district court, would, and you would, you would seek a preliminary injunction, assuming we didn't grant you one on appeal, the parties that we didn't reach standing as to, because under Little Sisters of the Poor, we don't have to, could they still, under your, your perspective, have relief running in their favor? Yes, and I think that's really the, the idea behind the Little Sisters case, where it was, of course, you know, considering an injunction against the federal government in that case. So I think, I think if you line those two cases up, that is what would happen. Now, we'd have to still meet all the preliminary injunction factors. I don't know what you mean. Oh, sorry. When you say that is what would happen, could you fill in what you're talking about? Oh, sure. Sorry. So if you look at the Little Sisters of the Poor case, and how that, what the posture was there, the lower. Counsel, I've read all those cases. Just tell me what you think would happen on remand, if you would please. Oh, sure, sure. I don't want to take up all your time. We would, we would, we would seek a prohibitory injunction against the enforcement of the word nonsectarian in the education code. You, you're just not. I'm sorry. Who's we in your sentence? On remand, would you go forward, just the parents or the schools? We would seek it on behalf of all of our clients, yes, yes, Your Honor. I'm not sure you're communicating with Judge Bennett. That's what my point is. Okay. Sorry. And you guys do a good job of helping each other out. Yes, Your Honor. I'm just trying to get to a clear answer, Julie. Yes. No. So everybody could get a preliminary injunction, in your view? That's, that's right. Yes. And I, again, I don't mean to be facetious in an important case, but that would also be true if one of your plaintiffs were the governor of Minnesota. I, I, I. Doesn't every party have to have standing? Every party has to have standing, but the Supreme Court has said that you should stop looking after you've decided that one of the parties does. And I think that also is what this, this court has said in cases like my against Sentex. So yeah, and, and of course, all the other courts of appeals say things like that. They say, we've decided, you know, one party has standing, we're done, let's move on to the merits. So I think that that is the typical way that courts of appeals do this. So I'm trying to figure out whether you think I shouldn't be bothered by the discrepancy, which seems to me to be quite inconsistent with our standard for standing that I just pointed out to you about the heads of the schools declarations, right? Should I, should I not be concerned about that? Because I just, if I find standing for, as to one family, or are you suggesting that at the next step on remand, if I decide they're standing for one party, then all parties can go forward. All parties can go forward. But of course, if you got further into the case, like, so for example, you get to the summary judgment stage of the case, then the, the standing inquiry gets looked at again. So that's the, that's the San Francisco U.S. CIS case. We're just asking for the level of standing inquiry at the outset of the case. This is up on a motion to dismiss and a denied preliminary injunction. But, but absolutely, and that, that's, that's why the, you know, they're going to look at the facts. And then you have many more facts in the record, you'd be able to decide, we'd be able to put forward our case. I don't, I don't think I got back to the governor of Minnesota question. I, I'm, I, I think that my answer is actually yes, though I have a hard time putting together how that, how they, how the governor would have standing. Well, that's, but, but, but see, that's, that's what I took your, your position as being that if person one has standing, then it really doesn't matter actually who persons two through 20 are. That's right. And maybe the, the Supreme Court mandated that in Little Sisters of the Poor, but it sure seems to me to be a strange way of approaching things. Well, I, I, I think it's, I think it's not if you just look at the one-party standing rule and how it gets applied. And I think it's sort of a, it's really a prudential judgment of the, of the way that the courts operate that, you know, you're going to be in court anyway. We're just going to decide this. But I, but I agree, it should get looked at again at later stages of the proceedings. So we're just talking about the sort of low level at the, at the outset of the case. Okay, but I want to understand, suppose, suppose we were to say that the California statute is unconstitutional because it, it violates the established free expression clause. And we're talking about the free expression rights of the parent to advocate, right? The free exercise right of the parent to advocate and put, put that on the table, yes. Right, that's what we're talking about. Yes, yes, Your Honor. And suppose we do that, what, what kind of relief ultimately does, would the parent get? I think we're, we would just get a prohibitory injunction that we would, we would be able to put that into the mix. Then you'd have your IEP discussion. Fix of the IEP. Sorry. Sorry, I shouldn't say into the mix. Into the IEP. It's not key that any kid could actually go to the religious or private school, but they want to because of all the other restrictions in the IDEA, correct? That's right. You would not be deciding those issues. You would just be deciding whether this particular discriminatory barrier, which they're up against right now, whether that, that would have to come out. So the IEP team could say, no, we're not placing the child here because that's not in his or her best interest. What they couldn't say is, we're not placing the child here because this is a Jewish secular school or a Catholic secular school or some other religion secular school. That's right. And they might also look at things like the mainstreaming issue that, that Judge Christen was mentioning. They might. But to, to go to what I think Judge Wardlaw's point is, a ruling that this no secular school statute were unconstitutional would not give the parents, as for example, the right to have NP placed at any particular school. It would not be a sort of carte blanche. That's exactly right. When we talk about redressability, which is also part of standing, the harm that you're complaining of, the redressable harm is quite narrow. It's the ability of the parents to advocate for this option at the IEP meeting. It is to get into the door. Yes, Your Honor. Yeah. Right. Get rid of the discriminatory barrier. And the schools may or may not otherwise qualify as NPSs. My read of the record is we really don't know that. Right. But that's a subsequent conversation. Based on, even if we gave you the relief, but you want it on account, there's, the schools don't actually have redressability, I guess is how I see it. Because that, they have a whole separate road to climb, even if the statute weren't on the books the way it's written. Yeah. I think, I think one way to maybe think about it, just compare it back to Carson again. Carson, they're, you know, Maine made all the same arguments and they said no standing. It's all over the BIO. It's all over the briefing. It's in the oral argument, which is very telling about this issue. And so the court just doesn't address it. Carson was like direct. You got the 10%, you know, tuition, right, paid for across the board. It was, it was not so dependent on individual characteristics of either the school or the kid. Right. Right. And that is a difference in the sense that here the categorical rule that we have a problem with is the exclusion of this entire category of school. But you're absolutely right. IDEA is set up to deal with unique needs. That's literally in the statute. It's very tailored to particular people. It is not, you're just not going to get that same kind of categorical ruling out of any IDEA proceeding. I'm not sure if my time is up or if I've got one more minute. You're over. Okay. Thank you, Your Honor. Thank you, Your Honor. Easy answer. Good morning, Your Honors. Thomas Prouty for the State Appellees. I may have pleased the court. The IDE recognizes that parents have a choice to enroll their children in private school, which could include a religious school for a religious education or the state's public education system. LEAs have to spend a fully proportionate amount of their IDEA dollars providing services to the families that choose private school. And they are required to consult with private schools and private school families about how to do that. And when they provide those services, they do it pursuant to a services plan, which is different than an IEP. In fact, the very concept... But isn't this, aren't these two schools ineligible to enter into those plans, those service plans? Is that what the contracts are called, the NPS contracts? No. LAUSD and every other school district in California can provide services to children in religious schools obtaining a religious education pursuant to a services plan. When families choose the state's public education system, LEAs are required to provide a FAPE pursuant to an IEP. Those terms, the legal meanings of those terms reflect their application only to the state's public education system. Were this... I see it. No, I'm sorry. But you were answering the question. But I mean, there is no dispute here, correct, that the secular schools who are plaintiffs here or secular Catholic schools or any other secular religious school who couldn't certify that they're non-secular pursuant to what you were just talking about, no child can be placed there for a FAPE, right? There's no question about that, right? That's correct. Okay. In California, California hasn't chosen to become a manager of sectarian institutions. So counsel, I mean, I think we're all familiar with, I mean, for example, I was particularly struck by the amicus brief from the California Catholic Conference, this horrible history in the 19th century of the Blaine Amendment and anti-Catholic sentiment and even the origins of the term secular. And I just can't understand how the state can defend a law which says Catholic schools, Catholic secular schools, Jewish secular schools, Muslim secular schools, Buddhist secular schools, they just don't qualify. Virtually every other private school can qualify, but religious schools don't. I just have a hard time understanding how under Trinity, Lutheran, Espinoza, Carson, the other cases, California can defend the statute. Thank you for posing that question. My understanding of the Blaine Amendment is it was an across-the-board prohibition on providing any aid going to sectarian institutions. That's not this case and that's not what we're talking about. What the Supreme Court has said for free exercise clause is denying a generally available public benefit. And that's where the free exercise clause comes into play. But there are instances in which a state will be providing aid or benefits to a large segment of the population and it's doing so in a non-neutral way or we know from... Sorry, did you say doing so in a non-neutral way? I'm sorry, in a neutral way. Okay. That's all right. And there are times where we know from Zelmon and Mitchell, these cases that talk about public funding going to sectarian institutions only when it results from the genuinely independent and private choices of individuals, that limiting language assuring neutrality by limiting both intentional and unintentional systemic favoritism. And that's a concern in this case. So I would agree with you. If there's a Blaine Amendment type law which is going to prevent any type of aid going to a sectarian institution, shame on California, but that's not this case. The line in this case with respect to the free exercise clause is whether there's a generally available public benefit being deprived. In all of those cases, there's a public benefit that is created for the very purpose of directly benefiting the recipient public. And that broad segment of the population has a vested right to receive it or to apply for it where there's neutral criteria being applied. In this case, the NPS system was created, it's a statutory creature, and it was created for one limited purpose, to serve as an adjunct to the state's public education system to provide the state's faith, which is the state's public education under public supervision and direction. And in California's view, we would judge this law under a rational basis? I believe the question in this court, strict scrutiny comes if there's a threshold burden imposed on religious exercise. The question here, in terms of whether there's even a threshold cognizable burden placed on private religious exercise, is... The parents think there is. Let's use the example of the one child who is receiving special education, and they think it's not sufficient because of a particular type, and I think this part's uncontested, at least make it a hypothetical, if you would please, uncontested that the type of speech therapy he needs isn't available in public schools, and they have to go to a private school. That's my hypo. So they think it is a burden on their free exercise to not have that option at the IEP meeting, this hypothetical follow-on IEP meeting. Following the discussion with my friend earlier, there was talk of a specific type of healing service, of touching, and that's not based on religion, and MTS is required... My hypothetical is it has nothing to do with religion, it has to do with there's something this child needs, my hypothetical child, right, we'll make it a hypothetical, to address a private school, and is at, let's say, at two, or maybe three, private school, and they want to be able to advocate that their child goes to a private school that is sectarian in nature. NPSs are not all private schools, and an NPS... My hypothetical, they are, okay. It's not a hypothetical, it's the law that an NPS carries out the IEP, which is settled on ultimately by the LEA. So here's the question, if LAUSD is deciding not to put a service that is required to achieve faith in its IEPs, then the plaintiffs already have the option to say... Right, they can unilaterally take their child out. Right, but they also currently have the option to advocate to the LAUSD IEP team, you need to provide this touching therapy. Right, but let's say they have a difference of agreement about that, and time is of the essence, because now they've lost a school year, and this is a child we're talking about. So, just if you could let me play Deppel's advocate to make sure I understand this. They decide, time's ticking, we're going to unilaterally take our child to school X, then there's going to be a due process hearing, then there's going to be... This takes a lot of time, but in the end, in my hypothetical, they prevail, and it's what they needed, they need. It seems then, the district either has to provide that, or pay for somebody else to provide that. If California, the challenge law here is whether the NPS is sectarian or not. To me, if we've already established that this touching therapy doesn't really have anything to do with religion, the IEP that they're going to take an NPS to, is set by the LEA. Wait a minute, this is a lot of acronyms, so if you could, the IEP, the Individual Education Plan... Right, LEAs make that final offer placement. That's a big problem here if we are going to go down the road of sectarian institutions, but the content of that IEP that LAUSD is making the offer of, that content doesn't change when they... I appreciate that, I know that. Okay, yes. They go to the NPS. Right, I get that, but if the NPS is otherwise capable of meeting the goals, what's the problem? Isn't it just the sectarian nature that is preventing that school from being on the list to be considered? No? I'm not sure I'm following, because the concern seems to be, from the earlier discussion, was that in the IEP team, the parent would say, you're telling me that I can't get this particular type of touching service as part of an IEP. Part of my hypothetical, not Judge Kristen's, was we need, I mean, they may not prevail, but we need to be able to place our child in, with their siblings, or in an orthodox secular school, and right now they can't make that argument because they can't possibly prevail on it because secular schools are excluded, but I didn't mean to jump in on Judge Kristen's hypothetical. That is not my hypothetical. Okay. But you can now turn it up. If there's one case that I'd ask you to read, and this ties into the legal meanings of these IDEA, an IEP is concerned with how the child's disability, not their religious beliefs, factor in the development, in the general education curriculum, which the federal regulations make a point of saying is the same education provided to non-disabled children in that public LEA. The ML case, 2017, unanimous decision, Fourth Circuit, cert was denied. It also involved orthodox Judaism. This is a case because you talked- What year was that case? Fourth Circuit. What year? 2017. Andrew, after the Andrew F. case, which is a Supreme Court- We have Espinoza, we have Trinity Lutheran, we have newer case law. This has really been a shift, so we're all doing our very best, but- What the ML case, what the ML case stood for, 2017, unanimous, also involved orthodox Judaism, was that the circumstances of the child that is relevant for purposes of the federal IDEA are the circumstances relating to their disability, not their religious beliefs. That's why I want you to answer my hypothetical and not Judge Bando's. That's okay. Of course I want you to answer his as well, but they are meaningfully different, and there's a reason that I ask the question the way I ask. My hypothetical, the disability, and the reason that the child's not getting a faith is the disability. It's not the orthodox nature of the school. But when they come to their IEP meeting and say, hey, our child needs this particular type of therapy and the district can't provide it, and we want this other school to be on the list, and we get that we can't unilaterally direct that, but we want to be able to advocate for that school. And we think that school is better for our child, not only because it provides this type of therapy that is needed, but also because what the IDEA is about is mainstreaming. And right now, this child, who is one of six, is being separated from his siblings every morning. Why wouldn't that be a fair argument for them to make? I don't know if they'd prevail. But it seems to me the kinds of things that that type of discussion happens in IEP meetings not infrequently. My understanding is LAUSD is not putting this particular service in the IEP because it's not necessary to achieve faith. If it were... Why isn't it necessary to achieve the mainstreaming goal of the statute? I guess the reason is the negative implication. LAUSD has a requirement to provide faith, and the parents already have the right to look at the LAUSD IEP team and say, provide this service, which we've already established has nothing to do with religion. Right, and so can you just help me out? And let's say in my hypothetical, they don't. They just disagree, right? They disagree. And the parents have the ability to unilaterally... It's on their dime, unilaterally place their child in the private school of their choice, have the due process hearing fight it out. If they lose at that hearing, and it's determined that their child didn't need that special type of therapy, nobody's going to reimburse them. If they prevail, they are entitled to reimbursement, I think. And then you're back to, so where's this child going to be, and who's going to pay for it? And they want to be able to advocate that he should stay right where he is, in my hypothetical, and that it should be on the district's dime. If they were correct, they would get reimbursement for that year in the religious school. And there's certain state put provisions in the IDEA, which allows the child to stay there. The next year, though, they would have had the benefit of the ruling that LAUSD was failing to provide the FAPE, and they would presumably change course to meet the federal obligations. So exactly. So they wouldn't necessarily get to even stay there. I mean, I think Judge Wardlaw's point is really well taken. This is very attenuated, but it seems to me that at bottom, what there's a standing and redressability is the ability to advocate for this, and on year two, in this hypothetical, are you telling me at that point, then, if they prevailed at their due process hearing, the district then either has to provide that service for them, or allow the child to stay where he is and pay for it. Is that not right? LAUSD, if it was declared that what they were doing didn't comply, they would have to start complying, and they could only stay in that NPS, assuming the state put provisions have run their course, the child wouldn't be, could only be in a certified NPS. And the question is, and NPSs have an obligation to work to transition the kid back. The goal is not to have kids in NPSs, right? Right, right. And so your point that all the other five children go to a private religious school, the parents, both in their complaint and in their direct declarations, have made it abundantly clear that they believe their free exercise rights are infringed because they're not able to obtain religious education. I fully appreciate that, which is why my hypothetical is different than Judge Bennett's hypothetical. What I'm positing is it seems like there's a skinnier version of this that doesn't require biting all of that off. And I wanted to give you an opportunity to tell me why you think I'm wrong. In Carson, which is the only case that the district court relied on to find standing for the family, the plaintiffs, if the challenged law were struck down, would be able to unilaterally and immediately point to a private religious school that qualified and obtained a private religious education. In this case, if the challenged law were struck down, it is unlikely that anything related to their IEP would change, and it is certain that they would not receive a religious education in a private religious school, which is the very thing they sued and they said, this is the religious exercise that's being infringed. So what's your argument that it's not being infringed? For the schools? For the parents. I don't think the schools have standing. For the families. You're unable to obtain a religious education if you choose the state's public education system. They have said the religious exercise that is being infringed is our ability to obtain a religious education. That's clear in the allegations of the complaint and in their preliminary instruction papers. So I don't know what the religious exercise is to receive the touching therapy that LAUSD may not be providing, the service that they say that they would like to be part of their IEP. We've already kind of talked about how that's not part of the touching relief. I think your answer to Judge Wardslaw's question is you think they haven't made the claim that I'm positing, the skinnier, what I'm calling the skinnier claim, and you think that they really have only sued for the larger claim that they're being denied a FAPE because they're not allowed to advocate for an orthodox school, to place their child in an orthodox school. If I followed that, I believe that's correct. The public benefits for IEP? Because if that's right, sir, and forgive me for interrupting, but we are trying to hear your point of view, because if that's right, why wouldn't we allow them, remand with direction to allow them to amend? They've had all these opportunities to say what other religious exercise? They're saying, and they've made it clear, our religion requires us to provide a religious education, which independent, unchallenged law prohibits if you choose the state's public education system. And there's been no articulation that there's some other religious exercise that's being infringed by this non-sectarian NPS requirement. So you said something earlier that I want to go back to. If they ended up going through the FAPE, and they choose FAPE, and then it turns out that they think they'd be better served by another school, and the state district agrees, do they get full tuition, or do they only get partial payments? If you go through FAPE, you get full tuition, right? The LEA is in full control of paying a master contract with the NPS. The families aren't getting something to pay for tuition. The payments are pursuant to a master contract, and the regulations make clear that the amount of that master contract is only supposed to reflect the services that the LEA tells the NPS to provide so that the NPS can properly act as an adjunct to the system. Right, so their argument is... And to address your question maybe better, that amount of compensation should reflect what it costs for that student to go there, to be in the class, and to receive special education services that allow it to make progress in the LEA's public education. So if the school determines this is our enrollment fee because it covers our cost, that's typically what the master contract will cover. Did your counsel want to... I was told it was 1520, and I was told my clock would be 15. I appreciate you taking the time with this case. It's 15-5 is what it is. Right, right. Do you have anything additional to say because he's well over? Um... One minute. Okay. Okay. Thank you. Sue Ann Evans for Los Angeles Unified School District. And the point that I wanted to make is really that we're rockin' hard place here. We are bound by the laws that are put in place by the state of California and by the federal law. So we're not in a position to be able to meet the asks of the appellants in this case. When it comes to waiver, I know that they have made a big point about the district pursuing waiver on their behalf. Waiver is an option, but waiver has to be requested. It has not been requested in this manner, and the record reflects. And really, waiver has to be consistent with a particular matter, particular need of a student, as opposed to generally we're going to seek a waiver of the sectarian requirement. And ultimately, it's not a decision that we make. Waiver is a decision that is made by the state superintendent. And with that, I will submit, unless there are any questions. Do other states have this provision, like the state of California? I haven't done an exhaustive 50-state survey. My understanding is that other states have an on-site training. It's hard for me to represent. Right. And suppose that we were to say that this statute does violate the religious clause. You can come back up. We said that because I think it's plain on its face it does. If you separate it from the whole IDEA and all the other regulations and how FAPE actually works and the choices the parents have to make when they're sending their kid to public education versus private or religious education, standing on its own, it's pretty clearly discriminatory. But if we were to say that, what's the practical implications of that? I think the question you have to really ask yourself here is, did California create the NPS system to serve as a way to benefit all private schools and then we're just leaving sectarian schools out? Or did California adopt the NPS system to help undertake an enormous, complex, and delicate task where there's over 1,000 school districts and charter schools, maybe 1,500 different sites across the nation where public officials are going to be handing parents with disabled children at their wit's end how to provide this child an education, saying this is the sectarian school that we're offering our FAPE offer of placement. The parents may say, well, or the guardian. There's all too many situations where it's a quote-unquote guardian. That's not my religion. So is the answer to Judge Wardlaw's question that there's a zillion of these schools and then once a child's placed into one of these schools, the school district defendants have an obligation to, they don't just hand off the child. They still have to monitor the education that child is given. Is that right? There's extensive state monitoring, not just monitoring, but assessment and direction, telling the school what it needs to do differently or else its certification is going to get revoked. Which sounds like a nightmare. But it sounds like they do that for all of the other private schools but not for sectarian schools. Am I missing that? The relationship where families choose private religious schools, they're getting a religious education just like the other five brothers or sisters of the family. The relationship there is we are LAUSD. We are required to consult with you about how to provide special education services with a fully proportionate amount of IDE dollars to you. Right. The things are different because there's economies of scale. When people are coming into your schools, you own the buildings, you employ the teachers. It's one curriculum that you're familiar with and you're providing the services. Families choose all sorts of private schools and so the services may differ here. A First Circuit decision. But counsel, counsel, Judge Wardlaw asked a really specific question and I'm dying to hear the answer. What are the ramifications? Is it the case that the school district would have to do what if sectarian schools are involved? Supervise them in some way or what is it? If the challenge law were struck down, sectarian entities where the primary fundamental organizing principle is the advancement of religion, they would say, well, we're still interested in being an NPS. A government official at the state level, my clients would determine whether it's a good and appropriate way for that sectarian institution to provide faith. Then the 1,500 different sites across California, should we enter into a master contract with them? There's no obligation for a school district to actually enter into a master contract. Because there's probably many other ways a school may not qualify to serve as an NPS. Is that a yes? Yes, it's a yes. And there's no need to just be willy-nilly certifying NPS. It's not a good way to operate a system to operate 1,000. Right, so the schools we're talking about here, I think it's a given, they would have to otherwise qualify. No one's suggesting they would just get to be NPSs, right? Exactly. Their position is they shouldn't be disqualified from applying to be an NPS, to sign that contract, simply because they're orthodox schools. And the state's concern is that even if you're willing to set aside that when there's a primary fundamental organizing principle of an organization, there's mission creep, or over time there could be hesitancy to fully provide the secular education. If the state knows that every year there's monitoring, every year there's state entanglement, and whether there's even going to be an orthodox Jewish NPS in District A or District B isn't up to a person in Sacramento. It's complete and utter government officials deciding which sect is best to provide faith, where the principles that then someone would question whether that's good or not are so amorphous that it's dangerous. The NPS system and the non-sectarian requirement assures neutrality. It does what we want government to do. And when the schools have already made it clear in their declarations that they exist for the very purpose of providing a religious education, their religious exercise is not being infringed. All right. I think I understand now. Thank you. I'll give you a couple minutes. Okay. I think I originally had five. Maybe I'll get slightly more than that. In any case, so several points, Your Honors. One, California is making the same public education argument that Maine did but with much worse facts. I mean, let's remember, we're talking about non-public schools that are defined in the state statute as private. What do you do with his excessive entanglement argument? So that was the exact same argument that got made by Maine and rejected by the Supreme Court.  Think of the foster care agencies in Fulton. Foster care agencies are under a lot of monitoring, and they are often religious like the plaintiff in the Fulton case. And they are, you know, we want the Child Protective Services and all the other entities to be deeply involved with that. But there are foster care agencies that just place kids with Jewish families. There's ones that are specialized for other religious groups. We don't back up and say we're just going to ignore this social fact and decide that there's a problem there. So I think that the entanglement argument, I think, is asked and answered. It's also just this is a motion to dismiss stage. Like, let's develop those facts. Right now, this is utter speculation on their part. You know, again, I would just point to 56034 of the Education Code. They're non-public. They're private. You know, it's considered under 56366 of the Education Code, alternative special education services. And then they also disclaim that it's state-operated. Mr. Prouty is not going to get up in court and defend the schools if they become MPSs and they get sued. They're going to have their own lawyers. They're not going to be represented by the state. They're not going to have sovereign immunity. They're not going to have qualified immunity. They're not going to be the state. They're going to be private entities that are doing something in lieu of what the public schools do. With respect to, you know, this is going to open up this whole world, under 10C, they're already doing that. So the reimbursement thing, they have to look at that. They have to monitor it. It just said that, you know, they would be looking at it and incorporating it in the IEP. The Bellflower case, currently paying for it, or under that case, maybe they're not still doing it, they're paying for, you know, New Harvest Christian Church to provide their full tuition under that case. So if you look at the Bellflower case, look at the facts of that case. So it's a district court case involving a school called Imago Dei, Image of God, 2021 Westlaw 3086146, which does the same thing. Full tuition for a Christian private school that they're monitoring. Maybe they're all entangled and they don't know it, but they're already doing it. On the waiver question, the LEA is the one who asks. That's the way the system works. The LEA asks, and the superintendent of the Department of Education, so it's a little confusing, but it's the superintendent at the state level, says yes. So that's that dialogue. On school standing, I would love to convince you, YAVNA already provides services to disabled children. That's at ER 187. So they're already providing some services. They just can't do the full board thing. You see some of these, you know, you can see some of the facts in this record. You know, you might have, like, eight different services. That's very difficult to just do out of pocket. Is there a way that they intend to apply to be an MPS? I think what I had was seek to qualify. That's what I've got in the record. I think in Paragraph 165, YAVNA seeks the ability to qualify as a certified MPS. Thank you, Your Honor. It's quite different than saying we intend to do it and we're going to do it. Or we're ready and able to do it. Well, I think that they're ready and able and they're at this for the reasons that we say in our briefing. Or at least you could amend to it. I don't see it here, sir. I don't see it. Now, the district court did say, oh, the schools can amend, right, in her order. But we did not because it was law of the case and there was also going to be a massive delay to the entire case. And as you mentioned earlier, Your Honor, you know, these kids aren't getting any younger. These are two different things. That's the parent's case, right? But as far as the schools go, she gave an opportunity to amend. The district court allowed that opportunity and chose to stand on this complaint. What do we do about that? Well, I think it just would have held up the whole case. I think it would have been very hard for us to take the appeal with just the parents and try to, you know, take it on two tracks. And so, you know, they do need relief. On the end, I just want to say that YAVNA is already doing it. So, you know, it's very similar to some of the things like the contractors that were ready and able in the ACG case and in Gratz. On the other states, we'd love the chance to get into discovery in this case and we can talk about what happens in other states and also whether there's schools in other states, you know, because, again, California pays for this service for schools out of state. There are MPSs in Montana and Arizona and other places. Get that opportunity. So we would love to get the chance to get into discovery about that. And then, you know, we didn't get to, you know, why there was too little on the merits in the district court opinion, but really the district court ruled on the Carson claim and kind of folded everything else into that claim. And, you know, for that reason alone, we would love to get the chance to go back down with all of our plaintiffs and have the court, you know, look at all of those five claims, all six claims rather, not just the one Carson claim, which, you know, essentially got folded together. And then, you know, the last thing is just that my opponent said that, you know, at the beginning of his remarks, they had a choice. And we would say this is not a choice that they should be put to. That is our argument. Our argument is that they... It puts them to that choice. What's that? It's not the state that puts them to that choice. It's the IDEA that puts them to that choice. Well, I would argue that the IDEA, this is the way it's supposed to work, is that you get your unique needs covered. These are unique needs that are not being met for these children with disabilities. They need the right to be able to get that. They have the entitlement to it, really. They have the entitlement under IDEA to get their unique needs met in their own particular situation. And what they're saying is you can't get that. You can't get the speech therapy for ML because you want to send them to a Jewish school. That's the choice that I don't think they should have to make. So the definition that a unique need that the IDEA speaks to includes the need to have a disability tended to in an orthodox school if there's a public school that allows the same? Well, we would argue that because part of the unique needs analysis is looking at all the needs of the child, so sort of some of the things you were talking about like siblings or where they're located or things like that. I think that's right, but here's what I'm... I think you're way over time, so if I can just kind of get to the... Are you claiming that if the school district were otherwise providing a FAPE but not in an orthodox school, that the school district would have to move the child? So we would disagree with the premise, but I suppose if you were under the statute, the IDEA would be fulfilled if there wasn't. But, of course, our allegations are that they're not getting a FAPE. Okay, so you're not answering my question, but I probably did a very good job of asking. I'm just going to... Judge Wardlaw's going to cut me off. She's got that hook here under the bench, and in a minute I'm going to get yanked. But my question is, to be clear, if in this hypothetical a child of a Jewish faith with a disability is having that disability met, otherwise has a FAPE that's being delivered, is it your position that if that's in the public school and not in a private school, that that alone would be a denial of FAPE? I think our position would be that it does deny it if in this kind of situation with these clients. I don't think it would necessarily be true for all religious schools, private schools, but for this situation, these children need an orthodox Jewish education as it will actually contribute to their well-being as children with disabilities. That's our position in this case. All right. Thank you very much. Laughlin v. The California Department of Education will be submitted in this session. The court is adjourned for today. All rise. This court for this session stands adjourned.
judges: WARDLAW, CHRISTEN, BENNETT